UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| COMCAST OF SACRAMENTO I, LLC; COMCAST OF SACRAMENTO II, LLC; and COMCAST OF SACRAMENTO III, LLC;<br><br>            Plaintiffs,<br><br>      v.<br><br>SACRAMENTO METROPOLITAN CABLE TELEVISION COMMISSION and DOES 1 through 20,<br><br>            Defendant. | CIV. NO. 2:16-cv-1264 WBS EFB<br><br><u>MEMORANDUM AND ORDER RE: MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT</u> |

----oo0oo----

        Plaintiffs Comcast of Sacramento I, Comcast of Sacramento II, and Comcast of Sacramento III brought this action against defendant the Sacramento Metropolitan Cable Television Commission, seeking return of a security deposit provided by plaintiffs' predecessor-in-interest to defendant some thirty-three years ago.  (Compl. (Docket No. 1).)  Plaintiffs now move for summary judgment against defendant, and defendant cross-moves

1

1  for summary judgment against plaintiffs.  (Pls.' Mot. (Docket No.

2  21); Def.'s Cross-Mot. (Docket No. 22).)

3  I.   Factual and Procedural Background[1]

4          Plaintiffs are mutually affiliated limited liability

5  companies which provide cable television service in Sacramento

6  County.  (See Docket No. 18; Decl. of Lee-Ann Peling ("Peling

7  Decl.") ¶ 2 (Docket No. 21-2); Def.'s Mot., Mem. ("Def.'s Mem.")

8  at 1 n.3, 12 (Docket No. 22-1).)  Defendant is a municipal

9  authority which "administer[s] and enforce[es] cable television

10  franchises and licenses" in Sacramento County.  (Decl. of Robert

11  Davison ¶ 2 (Docket No. 22-3).)

12          In 1984, plaintiffs' predecessor-in-interest

13  ("predecessor") provided a $250,000 deposit to defendant as

14  security for its performance of various obligations the county

15  imposed upon it as a cable franchisee.  (See Decl. of Jill Rowe

16  ("Rowe Decl.") ¶ 3 (Docket No. 21-3); Def.'s Req. for Judicial

17  Notice Ex. A, Sacramento Cnty. Code § 5.50.702 (Docket No. 22-

18  4).[2])  In 1992, defendant refunded all but $100,000 of the

19  deposit to the predecessor after it had satisfied some of those

20  obligations.  (Rowe Decl. ¶ 4.)  Pursuant to Sacramento County

21  Code section 5.50.702, defendant was to hold the remaining

22  $100,000 ("security deposit") in an interest-bearing account

23

24        [1]     The facts discussed in this Order are not disputed.

25        [2]     The court hereby takes judicial notice of the
26  provisions of Sacramento County Code provided with defendant's
    Cross-Motion (Docket No. 22-4 Ex. A) and plaintiffs' Reply
27  (Docket No. 25-1 Exs. 1-4).  See Tollis, Inc. v. Cty. of San
    Diego, 505 F.3d 935, 938 n.1 (9th Cir. 2007) ("Municipal
28  ordinances are proper subjects for judicial notice.").

2

1   until "termination of the [predecessor's] franchise and

2   satisfaction of any damages . . . which may be due" to defendant,

3   at which time the security deposit and its accrued interest would

4   be returned to the predecessor.  (Sacramento Cnty. Code §

5   5.50.702.)

6         After 1992, plaintiffs became successors-in-interest to

7   the predecessor's franchise and the security deposit.  (See Rowe

8   Decl. ¶ 4.)

9         In 2006, California passed the Digital Infrastructure

10  and Video Competition Act ("DIVCA"), which divested municipal

11  authorities of all "franchise-granting authority" for "video

12  service[s]" and vested such authority in the California Public

13  Utilities Commission ("CPUC").  Cal. Pub. Util. Code § 5840(a);

14  Cty. of Los Angeles v. Time Warner NY Cable LLC, No. CV-12-06655

15  SJO (JCx), 2013 WL 12126774, at *2 (C.D. Cal. July 3, 2013).

16  Pursuant to DIVCA, plaintiffs switched to a CPUC-issued franchise

17  in 2011.  (Davison Decl. ¶ 5.)  At that time, the defendant-

18  issued franchise plaintiffs had been operating under terminated

19  by operation of law.  (Steiner Decl. ¶ 6.)

20        Following the termination of plaintiffs' franchise with

21  defendant, plaintiffs and defendant became embroiled in a dispute

22  over the amount of fees plaintiffs are required to pay defendant

23  under DIVCA.  (See Davison Decl. ¶ 8.)  Under DIVCA, plaintiffs

24  are required to pay: (1) an annually determined administrative

25  fee to CPUC ("CPUC fee"), Cal. Pub. Util. Code § 441; (2) a state

26  franchise fee of five percent of gross revenues to defendant

27  ("state franchise fee"), id. § 5840(q)(1); and (3) a public,

28  educational, and government programming fee of one percent of

gross revenues to defendant ("PEG fee"), id. § 5870(n).  The
parties disagree about whether plaintiffs are entitled to deduct
their CPUC fee payments from their state franchise fee payments
under federal law, and whether payments they collect from their
subscribers to pay PEG fees must be included in their gross
revenues for purposes of calculating their state franchise fees.

On November 10, 2014, plaintiffs sent a letter to
defendant demanding return of the security deposit.  (Steiner
Decl. Ex. 1 at 33-36, Security Deposit Demand.)  Contending that
plaintiffs underpaid state franchise fees for the 2011 and 2012
calendar years by $334,610, defendant rejected plaintiffs' demand
and notified them that it would be keeping the security deposit
as a partial set-off against the amount allegedly owed.  (Davison
Decl. ¶¶ 6, 8.)  In March 2015, defendant transferred the
security deposit from the interest-bearing account it had been
held in to defendant's general account.  (See Peling Decl. ¶ 4.)
The security deposit, with interest, totaled $227,639.45 at the
time of transfer.  (Rowe Decl. ¶ 5.)

On June 8, 2016, plaintiffs filed this action.
(Compl.)  Plaintiffs allege causes of action for conversion and
"common count" against defendant, seeking payment of the security
deposit, interest the deposit accrued up to the date it was
transferred to defendant's general account, and prejudgment
interest calculated at seven percent per annum the deposit
accrued from the date it was transferred to the date judgment is
entered in this case.  (Id. at 4; Pls.' Mot., Mem. ("Pls.' Mem.")
at 11 (Docket No. 21-1).)  According to plaintiffs, the total
amount sought as of April 3, 2017 is $260,818.16.  (See Pls.'

4

1  Mem. at 11.)

2          Plaintiffs now move for summary judgment against

3  defendant.  (Pls.' Mot.)  Defendant cross-moves for summary

4  judgment against plaintiffs.  (Def.'s Cross-Mot.)  Defendant

5  bases its Cross-Motion on three affirmative defenses: (1)

6  immunity under California Government Code section 815, (2)

7  expiration of the applicable statute of limitations, and (3)

8  right to set off plaintiffs' security deposit and its accrued

9  interest against state franchise fees allegedly owed by

10  plaintiffs for the 2011 and 2012 calendar years.  (See Def.'s

11  Mem. at 4-5, 12.)

12  II.  Legal Standard

13          Summary judgment is proper "if the movant shows that

14  there is no genuine dispute as to any material fact and the

15  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

16  P. 56(a).  A material fact is one that could affect the outcome

17  of the suit, and a genuine issue is one that could permit a

18  reasonable jury to enter a verdict in the non-moving party's

19  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

20  (1986).  "[W]here the operative facts are substantially

21  undisputed, and the heart of the controversy is the legal effect

22  of such facts, such a dispute effectively becomes a question of

23  law that can, quite properly, be decided on summary judgment."

24  Joyce v. Renaissance Design Inc., No. CV 99-07995 LGB (EX), 2000

25  WL 34335721, at *2 (C.D. Cal. May 3, 2000); see also Braxton-

26  Secret v. A.H. Robins Co., 769 F.2d 528, 531 (9th Cir. 1985)

27  ("[W]here the palpable facts are substantially undisputed, [the

28  controverted] issues can become questions of law which may be

1  properly decided by summary judgment.").

2  III. <u>Discussion</u>

3         Defendant focuses exclusively on affirmative defenses

4  in its Cross-Motion.  It does not dispute that absent the issues

5  raised in its affirmative defenses, plaintiffs are entitled to

6  the security deposit and its accrued interest under their

7  conversion and "common count" causes of action.

8         To succeed on a conversion claim under California law,

9  plaintiffs must establish: "(1) [their] ownership or right to

10  possession of the [disputed] property; (2) the defendant's

11  conversion by a wrongful act or disposition of property rights;

12  and (3) damages." <u>Mendoza v. Rast Produce Co.</u>, 140 Cal. App. 4th

13  1395, 1405 (5th Dist. 2006) (quoting <u>Burlesci v. Petersen</u>, 68

14  Cal. App. 4th 1062, 1066 (1st Dist. 1998)).  Here, it is

15  undisputed that plaintiffs' predecessor provided a $250,000

16  deposit to defendant and that plaintiffs are successors-in-

17  interest to the remaining portion of that deposit and its accrued

18  interest.  (<u>See</u> Rowe Decl. ¶ 3; Davison Decl. ¶ 4.)  It is also

19  undisputed that after plaintiffs' franchise with defendant

20  terminated, at which time the security deposit became due to

21  plaintiffs, (<u>see</u> Sacramento Cnty. Code § 5.50.702), defendant

22  transferred the security deposit to its general account, causing

23  monetary loss to plaintiffs.  (<u>See</u> Peling Decl. ¶ 4; Davison

24  Decl. ¶ 9.)  Thus, plaintiffs have established a facially valid

25  conversion claim in this action.

26         Plaintiffs state a second cause of action for "common

27  count."  "A common count is not a specific cause of action,

28  however; rather, it is a simplified form of pleading normally

1  used to aver the existence of various forms of monetary

2  indebtedness . . . .” <u>McBride v. Boughton</u>, 123 Cal. App. 4th

3  379, 394, (1st Dist. 2004) (citing <u>Zumbrun v. Univ. of S.</u>

4  <u>California</u>, 25 Cal. App. 3d 1, 14-15 (2d Dist. 1972)).  “When a

5  common count is used as an alternative way of seeking the same

6  recovery demanded in a specific cause of action, and is based on

7  the same facts,” it “must stand or fall with [the specific] cause

8  of action.” <u>Id.</u> (citing <u>Zumbrun</u>, 25 Cal. App. 3d at 14 and

9  <u>Farmers Ins. Exch. v. Zerin</u>, 53 Cal. App. 4th 445, 459-60 (3d

10  Dist. 1997)).  Because plaintiffs’ “common count” claim appears

11  to seek the same relief and be based on the same facts as their

12  conversion claim, the court will decide their “common count”

13  claim together with their conversion claim.

14       Having addressed the facial validity of plaintiffs’

15  claims, the court next addresses whether plaintiffs’ claims

16  survive defendant’s affirmative defenses.

17    A.    <u>Immunity Under California Government Code Section 815</u>

18       Defendant contends that plaintiffs’ claims are barred

19  under California Government Code section 815 (“section 815”)

20  because they are not statutory causes of action.  (Def.’s Mem. at

21  4.)  Section 815 states that “[e]xcept provided by statute . . .

22  [a] public entity is not liable for an injury, whether such

23  injury arises out of an act or omission of the public entity or a

24  public employee or any other person.”  Cal. Gov’t Code § 815(a).

25       Plaintiff correctly notes, however, that section 815’s

26  bar on non-statutory claims does not apply to claims based on

27  contract.  <u>See</u> Cal. Gov’t Code § 814 (noting that section 815

28  does not “affect[] liability based on contract”).  “Whether an

7

action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded." Util. Audit Co. v. City of Los Angeles, 112 Cal. App. 4th 950, 958 (2d Dist. 2003).  An action "based on breach of promise . . . is contractual." Id.  An action "based on breach of a noncontractual duty . . . is tortious." Id.  "If unclear the action will be considered based on contract rather than tort." Id. (citing Roe v. State of California, 94 Cal. App. 4th 64, 113 (1st Dist. 2001)).

        Though plaintiffs' sole operative cause of action is a tort, see Moore v. Regents of Univ. of California, 51 Cal. 3d 120, 136 (1990) (referring to conversion as a "tort"), the right sued upon in this case is contractual.  The provision giving rise to plaintiffs' claim for return of the security deposit is Sacramento County Code section 5.50.702 ("section 5.50.702"), which acts as a promise on defendant's part to return the deposit to plaintiffs "[u]pon termination of the [their] franchise and satisfaction of any damages . . . which may be due" to defendant. (Sacramento Cnty. Code § 5.50.702.)  Sacramento County Code section 5.50.018 expressly refers to section 5.50.702 as a "provision[] of . . . contract."  (See Docket No. 25-1 Ex. 1, Sacramento Cnty. Code § 5.50.018 ("All . . . provisions of [franchise] contract[s] shall be deemed to be embodied in the Franchise Documents . . . ."); Sacramento Cnty. Code § 5.50.012j (defining "Franchise Documents" to include Sacramento County Code section 5.50.702).)  Thus, this action is based on contract, and not subject to section 815's bar on non-statutory actions.

        B.    Statute of Limitations

1    Defendant next contends that plaintiffs' claims are

2  barred under California Code of Civil Procedure section 338

3  ("section 338"), (see Def.'s Mem. at 12), which imposes a three-

4  year limitations period on conversion claims, see Cal. Civ. Proc.

5  Code § 338(c)(1) (subjecting "action[s] for taking, detaining, or

6  injuring goods or chattels" to three-year limitations period);

7  AmerUS Life Ins. Co. v. Bank of Am., N.A., 143 Cal. App. 4th 631,

8  639 (2d Dist. 2006) ("[California] Code of Civil Procedure,

9  section 338, subdivision (c) . . . applies to the conversion of

10  personal property . . . ."). According to defendant, section

11  338's limitations period began to run in this case when

12  plaintiffs' franchise with defendant terminated in 2011, at which

13  time the security deposit became due to plaintiffs. (See Def.'s

14  Mem. at 12.) Because plaintiffs did not file this action until

15  June 2016, defendant contends, this action is barred under

16  section 338. (Id.)

17    Plaintiffs correctly note that under California law,

18  however, the limitations period on a conversion claim that arises

19  from an originally lawful taking "does not begin to run until the

20  return of the property has been demanded and refused or until a

21  repudiation of the owner's title is unequivocally brought to her

22  or his attention." Ramirez v. Tulare Cnty. District Attorney's

23  Office, No. F071223, 2017 WL 1007953, at *15 (5th Dist. Mar. 15,

24  2017) (quoting Coy v. Cnty. of Los Angeles, 235 Cal. App. 3d

25  1077, 1088 (2d Dist. 1991)). Here, it is undisputed that

26  defendant's receipt of $250,000 from plaintiffs' predecessor was

27  originally lawful. (See Pls.' Mem. at 5; Def.'s Mem. at 12.)

28  Thus, section 338's limitations period did not begin to run in

1  this case until plaintiffs demanded and were refused the security

2  deposit or had unequivocal notice that defendant repudiated their

3  ownership of the security deposit.

4          The evidence before the court indicates that

5  plaintiffs' action is timely under both limitations triggering

6  tests.  According to an affidavit submitted by plaintiffs,

7  plaintiffs did not demand the security deposit until November 10,

8  2014, and defendant did not repudiate their ownership of the

9  security deposit until March 2015, when it informed plaintiffs

10  that it would be transferring the security deposit to its general

11  account.  (See Peling Decl. ¶¶ 4-5.)  Defendant has not cited any

12  evidence indicating that a demand or repudiation took place prior

13  to November 2014.  Because plaintiffs filed this action on June

14  8, 2016, the evidence before the court indicates that this action

15  is timely under section 338.

16          Defendant requests, as an alternative to judgment under

17  section 338, that the court continue disposition of its section

18  338 defense to allow it to conduct discovery regarding that

19  defense.  (Def.'s Mem. at 13.)  The Ninth Circuit has held that a

20  party requesting continuance of a summary judgment motion to

21  conduct discovery "must identify by affidavit the specific facts

22  that [the] discovery would reveal" and "explain why [such]

23  information . . . [is] essential to [that party's] opposition" to

24  the other party's motion.  Tatum v. City & Cnty. of San

25  Francisco, 441 F.3d 1090, 1100 (9th Cir. 2006) (citing Fed. R.

26  Civ. P. 56(d)); see also State of Cal. v. Campbell, 138 F.3d 772,

27  779 (9th Cir. 1998) (same).  Here, defendant represents that

28  discovery would reveal "whether [plaintiffs] made any demand for

1  return of [their] security deposit prior to November 2014,"

2  which, according to defendant, is essential to any opposition it

3  might raise to plaintiffs' position that this action is timely

4  under the limitations triggering tests they have cited.  (See

5  Steiner Decl. ¶ 7.)

6          Putting aside the fact that there is already evidence

7  indicating that plaintiffs did not demand return of the security

8  deposit prior to November 2014, (see Peling Decl. ¶ 5), defendant

9  fails to explain why the information it seeks is essential to

10 showing that this action is untimely.  The limitations triggering

11 test at issue in defendant's discovery request is demand of the

12 property in question and refusal of such demand.  See Ramirez,

13 2017 WL 1007953, at *15.  Because defendant can only refuse

14 plaintiffs' demand after they have made a demand, the date of

15 refusal is dispositive of whether plaintiffs demanded and

16 defendant refused to return the security deposit prior to June 8,

17 2013.[3]  Thus, the date on which plaintiffs first demanded return

18 of their security deposit is not essential to that inquiry.

19 Because the date of plaintiffs' first demand is not essential to

20 defendant's statute of limitations defense, the court will deny

21 defendant's request for continuance.

22      C.   Right to Set-Off

23          Defendant focuses most of its Cross-Motion brief on its

24 set-off defense.  That defense, as indicated in the fact section

25 _____

26      [3]   If defendant refused a demand prior to June 8, 2013,
   this action is untimely.  If defendant did not refuse a demand
27 prior to June 8, 2013, this action is timely (assuming defendant
   also did not unequivocally repudiate plaintiffs' ownership of the
28 security deposit prior to that date).

of this Order, posits that defendant has a right to set off plaintiffs' security deposit and its accrued interest against $334,610 in state franchise fees that plaintiffs allegedly underpaid for the 2011 and 2012 calendar years.

California Code of Civil Procedure section 431.70 states that "[w]here cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other . . . ."  Cal. Civ. Proc. Code § 431.70.  This procedure, often referred to as a "set-off," is intended to "eliminate[] a superfluous exchange of money between the parties."  Jess v. Herrmann, 26 Cal. 3d 131, 137 (1979).

"[A] defendant may . . . assert [a] setoff defensively to defeat the plaintiff's claim in whole or in part," though it "may not [use the setoff to] obtain an award of affirmative relief against [the] plaintiff."  Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co., 29 Cal. 4th 189, 198, (2002).  In determining whether to grant a set-off, the court may adjudicate the merits of yet-to-be-adjudicated set-off claims.  See, e.g., Unicom Sys., Inc. v. Farmers Grp., Inc., 405 F. App'x 152, 154 (9th Cir. 2010) (affirming lower court's adjudication of merits of set-off claim).

Defendant asserts, and plaintiffs do not dispute, that timely cross-demands for the security deposit and state franchise fees in question existed concurrently after the state franchise fees for the 2011 and 2012 calendar years became due.  (See

1    Def.'s Mem. at 5.)  Plaintiffs also do not dispute that they did

2    not pay the state franchise fees in question.  (See Peling Decl.

3    ¶¶ 7-8.)  They dispute only whether defendant may charge them

4    such fees.

5         The state franchise fees in question consist of fees

6    that plaintiffs allegedly underpaid for the 2011 and 2012

7    calendar years because they: (1) unilaterally deducted their CPUC

8    fees from their state franchise fees, and (2) failed to include

9    payments they collected from subscribers to pay PEG fees in their

10   gross revenues in calculating their state franchise fees.

11              1.    Deduction of CPUC Fees

12        The parties' dispute with respect to plaintiffs'

13   deduction of CPUC fees centers over the interpretation of 47

14   U.S.C. § 542 ("section 542"), subdivision (b) of which states

15   that "[f]or any twelve-month period, the franchise fees paid by a

16   cable operator with respect to any cable system shall not exceed

17   5 percent of such cable operator's gross revenues derived in such

18   period from the operation of the cable system to provide cable

19   services."  47 U.S.C. § 542(b).  Defendant argues that the CPUC

20   fee is not a "franchise fee" within the meaning of section

21   542(b), and thus does not count toward the five percent cap it

22   imposes.  (Def.'s Mem. at 7.)  Plaintiffs argue that the CPUC fee

23   is a "franchise fee" within the meaning of section 542(b), and

24   thus counts toward its five percent cap.  (Pls.' Mem. at 7.)

25   Because the CPUC fee counts toward section 542(b)'s five percent

26   cap, according to plaintiffs, the five percent state franchise

27   fee they are obligated to pay defendant under DIVCA must be

28   reduced by the CPUC fee, pursuant to the principle of federal

1  preemption.

2        Section 542(g)(1) defines "franchise fee" to include

3  "any tax, fee, or assessment of any kind imposed by a franchising

4  authority or other governmental entity on a cable operator . . .

5  solely because of [its] status as such."  47 U.S.C. § 542(g)(1).

6  Section 542(g)(2) expressly excludes from its definition of

7  "franchise fee" "any tax, fee, or assessment of general

8  applicability (including any such tax, fee, or assessment imposed

9  on both utilities and cable operators or their services but not

10 including a tax, fee, or assessment which is unduly

11 discriminatory against cable operators)."  Id. § 542(g)(2)(A).

12       The CPUC fee, codified in California Public Utilities

13 Code section 441 ("section 441"), applies not only to cable

14 operators, but to all "holders of a state franchise" that

15 authorizes the "operation of any network in the right-of-way

16 capable of providing video service to subscribers" ("video

17 franchise holders").  Cal. Pub. Util. Code §§ 441, 5830(f), (h);

18 see also Time Warner, 2013 WL 12126774, at *5 (noting that "it is

19 possible to qualify for [the CPUC] fee without being a cable

20 operator").  "[N]on-cable operat[ing] video [franchise holders

21 such] as Netflix, RedBox, and Blockbuster" may be subject to the

22 CPUC fee.  Time Warner, 2013 WL 12126774, at *5.

23       In view of the applicability of the CPUC fee to non-

24 cable operating video franchise holders, it would not be proper

25 to conclude that the fee is imposed on cable operators "solely

26 because of their status as such."  The CPUC fee is imposed on

27 cable operators because of their status as video franchise

28 holders, a status that is different from the status of being

                                14

1  cable operators.  If a given cable company were to stop operating

2  cable, it would still be subject to the CPUC fee so long as it

3  holds a video franchise.

4      The applicability of the CPUC fee to non-cable

5  operators also supports finding that it is a "fee . . . of

6  general applicability" under section 542(g)(2).  As noted above,

7  all entities that hold a video franchise, not merely cable

8  operators, are subject to the CPUC fee.  The CPUC fee is not

9  unduly discriminatory towards cable operators because it does not

10  apply only to them.  Thus, the court finds that the CPUC fee is a

11  fee "of general applicability" under section 542(g)(2).[4]

12      Because the CPUC fee is not imposed on cable companies

13  "solely because of their status as such," and because it is a

14  "fee . . . of general applicability," the CPUC fee is not a

15  "franchise fee" within the meaning of section 542.

16      The court's position on this issue accords with the

17  position of at least two other courts, which have also held fees

18  that are imposed on non-cable operating entities to be excluded

19  _____

20  [4]    At oral argument, plaintiffs argued at length that the
    CPUC fee does not apply to utilities because CPUC charges a

21  separate fee to "electrical, gas, telephone, telegraph, water,
    sewer system, and heat corporation[s] and every other public

22  utility."  (See also Pls.' Reply at 9-10 (citing Cal. Pub. Util.
    Code § 431) (Docket No. 25).)  That a given entity is subject to

23  CPUC's utility fee, however, does not mean that it may not also
    be subject to CPUC's video franchise fee.  Section 441, by its

24  terms, imposes its fee on all holders of a video franchise; it
    makes no exceptions for entities subject to other fees imposed by

25  CPUC.  Moreover, even if the court were to find that the CPUC fee
    does not apply to utilities, that would not preclude the CPUC fee

26  from being a fee of general applicability under section
    542(g)(2).  See 47 U.S.C. § 542 (merely stating that fees of

27  general applicability "includ[e] . . . fee[s] . . . imposed on

28  both utilities and cable operators").

1  from the definition of "franchise fees" under section 542.  See

2  Zayo Grp., LLC v. Mayor & City Council of Baltimore, No. JFM-16-

3  592, 2016 WL 3448261 (D. Md. June 14, 2016) (holding that conduit

4  use fee that applies to "all users of the City's conduit system,"

5  not merely cable companies, is not "franchise fee" within the

6  meaning of section 542); City of Eugene v. Comcast of Oregon II,

7  Inc., 359 Or. 528, 558 (2016) (holding that license fee that

8  applies to all companies that "provide[] telecommunications

9  services over . . . public rights of way," not merely cable

10  companies, is not "franchise fee" within the meaning of section

11  542).

12       Plaintiffs cite Time Warner, 2013 WL 12126774, for the

13  contrary position.  In Time Warner, the court noted that though

14  the CPUC fee applies to non-cable operators, section 542 "does

15  not require that a franchise fee be a fee assessed solely against

16  cable operators; [instead,] it requires that cable operators'

17  status as cable operators be the sole reason for assessment of a

18  franchise fee."  Id. at *5.  Noting that the defendant cable

19  company used its video franchise only to operate cable service,

20  the Time Warner court reasoned that if the company did not

21  operate cable service, it would not be a video franchisee, and

22  thus not be subject to the CPUC fee.  See id.  Based on that

23  reasoning, the Time Warner court concluded that the company's

24  status as a cable operator was the sole reason it was subject to

25  the CPUC fee.  Id.

26       This court disagrees with Time Warner's analysis.

27  Assuming Time Warner's paraphrase of section 542 to be correct,

28  it still would not be the case that a cable company's status as a

cable operator is the sole reason it is subject to the CPUC fee. As explained above, a cable company is subject to the CPUC fee for the separate reason that it is a video franchise holder. That a cable company uses its video franchise only to provide cable service does not change the fact that it is a video franchise holder, and thus subject to the CPUC fee for that reason. It requires a leap of logic to conclude, as <u>Time Warner</u> did, that entities that use their video franchise only to provide cable service would not be video franchisees if they did not provide cable service. Thus, in this court's view, <u>Time Warner</u>'s conclusion does not follow from its premises. Because <u>Time Warner</u> is an unpublished district court decision, this court is not bound to follow it. <u>See</u> <u>People of Territory of Guam v. Yang</u>, 800 F.2d 945, 949 (9th Cir. 1986) ("The law is clear that an unpublished district court decision has no precedential authority.").

For the reasons stated above, the court finds that the CPUC fee is not a "franchise fee" within the meaning of section 542. Because the CPUC fee is not a "franchise fee" within the meaning of section 542, plaintiffs were not entitled under section 542 to deduct CPUC fees from their state franchise fees for the 2011 and 2012 calendar years.

2. <u>Failure to Include PEG Payments in Gross Revenues</u>

The parties also dispute whether plaintiffs must include payments they collect from subscribers to pay PEG fees in their gross revenues for purposes of calculating their state franchise fees. Their dispute centers over the interpretation of California Public Utilities Code section 5860 ("section 5860").

17

1          Section 5860(d) defines "gross revenue" for purposes of

2    state franchise fees as:

3        [A]ll revenue actually received by the holder of a
         state franchise, as determined in accordance with
4        generally accepted accounting principles, that is
         derived from the operation of the holder's network to
5        provide cable or video service within the jurisdiction
         of the local entity, including . . . [a]ll charges
6        billed to subscribers for any and all cable service or
         video service provided by the holder of a state
7        franchise, including all revenue related to
         programming provided to the subscriber, equipment
8        rentals, late fees, and insufficient fund fees.
9

10   Cal. Pub. Util. Code § 5860(d).

11          Section 5860(e), however, states that "the term 'gross

12   revenue' set forth in [section 5860(d)] does not include . . .

13   [a]mounts billed to, and collected from, subscribers to recover

14   any tax, fee, or surcharge imposed by any governmental entity on

15   the holder of a state franchise, including, but not limited to,

16   sales and use taxes, gross receipts taxes, excise taxes, utility

17   users taxes, public service taxes, communication taxes, and any

18   other fee not imposed by this section."  Id. § 5860(e).

19          Plaintiffs argue that payments they collect from

20   subscribers to pay PEG fees fit squarely within the exception

21   stated in section 5860(e), and thus are not part of "gross

22   revenues" as defined in section 5860(d).

23          Plaintiffs' position appears to be correct.  PEG fees,

24   which are allowed under California Public Utilities code section

25   5870 ("section 5870") and established pursuant to Sacramento

26   County Code, are charged by defendant to plaintiffs.  (Peling

27   Decl. ¶ 8.)  Plaintiffs, in turn, pass the fee on to their

28   subscribers, (id.), who pay the fee "as a separate line item on

1    [their] regular bill," Cal. Pub. Util. Code § 5870(o).

2    Plaintiffs then forward the PEG payments made by their

3    subscribers to defendant.  (Peling Decl. ¶ 8.)  This procedure is

4    expressly authorized and described in section 5870(o).  Cal. Pub.

5    Util. Code § 5870(o).  Because the payments plaintiffs collect

6    from their subscribers to pay PEG fees are "amounts billed to,

7    and collected from, subscribers to recover . . . [a] fee . . .

8    imposed by [a] governmental entity," they are not part of "gross

9    revenue[s]" as defined in section 5860(d).

10          Defendant contends that section 5860(e)'s exception

11   applies only to payments collected from subscribers to recover

12   "fee[s] not imposed by [section 5860]," and that PEG fees are

13   imposed pursuant to section 5860(c).  (Def.'s Mem. at 9-10.)

14   Because PEG fees are imposed pursuant to section 5860, defendant

15   concludes, payments collected to recover them are "gross

16   revenues."

17          Both premises supporting this argument are flawed.

18   Section 5860(e) does not limit its exception to "fee[s] not

19   imposed by [section 5860]."  It expressly states that its

20   exception "includ[es], but [is] not limited to . . . fee[s] not

21   imposed by [section 5860]."  Cal. Pub. Util. Code § 5860(e).

22   Moreover, there is no indication that section 5860 imposes PEG

23   fees.  Section 5860(c), which defendant cites for that assertion,

24   merely authorizes "local entit[ies] to impose utility user taxes

25   and other generally applicable taxes, fees, and charges under

26   other applicable provisions of state law."  Id. § 5860(c).

27   Nowhere does it impose PEG fees.  Thus, defendant's argument is

28   without merit.

1      Defendant also argues that plaintiffs were not

2   permitted, as a procedural matter, to unilaterally deduct PEG

3   payments collected from subscribers from their gross revenues in

4   calculating state franchise fees.  City of Glendale v. Marcus

5   Cable Assocs., LLC, 231 Cal. App. 4th 1359 (2d Dist. 2014),

6   according to defendant, stands for the proposition that a cable

7   company may not unilaterally withhold disputed state franchise

8   fees from municipal authorities.  (Def.'s Mem. at 10-11.)

9   Instead, the company must pay the fees to the authority, then

10  challenge whether the fees were proper in court.  (Id.)  Because

11  plaintiffs unilaterally deducted PEG payments from their gross

12  revenues in calculating state franchise fees for the 2011 and

13  2012 calendar years, defendant contends, defendant is entitled to

14  the state franchise fees plaintiffs would otherwise have paid for

15  those cycles under City of Glendale.

16      This argument is without merit as well.  City of

17  Glendale was a case that affirmed a lower court's denial of a

18  cable company's request for a declaration stating that it may

19  withhold future PEG fee payments in order to offset past PEG fee

20  overpayments.  See City of Glendale, 231 Cal. App. 4th at 1378.

21  City of Glendale was decided based on the court's conclusion that

22  such a declaration would, in effect, circumvent 47 U.S.C. §

23  555a's prohibition on award of damages against governmental

24  entities in cable regulation suits.  See id.  The case did not

25  decide the legality of unilaterally withholding disputed state

26  franchise fees.  Thus, City of Glendale does not stand for the

27

28

1  proposition defendant cites it for.[5]

2          Because the payments plaintiffs collect from

3  subscribers to pay PEG fees are not part of "gross revenue[s]"

4  under section 5860, plaintiffs were entitled to withhold them

5  from their gross revenues when calculating state franchise fees

6  for the 2011 and 2012 calendar years.

7          For the reasons stated in this Order, the court finds

8  that plaintiffs have established a valid conversion claim for

9  _____

         [5]    City of Glendale raises the question of whether this

10  action is barred under 47 U.S.C. § 555a ("section 555a").
     Section 555a states that "[i]n any court proceeding . . .

11  involving any claim against a . . . governmental entity . . .
     arising from the regulation of cable service . . . any relief . .

12  . shall be limited to injunctive relief and declaratory relief."
     47 U.S.C. § 555a.  Here, plaintiffs are seeking return of a

13  security deposit plus interest.  But defendant has already
     transferred that money to its general account.  (Peling Decl. ¶

14  4.)  Thus, an argument can be made that this is a suit for
     damages.  See Edelman v. Jordan, 415 U.S. 651, 677 (1974)

15  (holding that "prospective injunctive relief . . . may not
     include a retroactive award which requires the payment of funds

16  from the state treasury").
             It is doubtful, however, that this action "aris[es]

17  from the regulation of cable service" under section 555a.  The
     parties' dispute is about defendant's failure to return a

18  security deposit.  The court is not aware of a case that has held
     or suggested that an action brought by a cable company to recover

19  a security deposit from a cable-regulating entity is one that
     "aris[es] from the regulation of cable service" under section

20  555a.  Cases that have applied section 555a appear to indicate
     that section 555a was meant to bar claims arising directly out of

21  cable regulation, as opposed to claims that are only tangentially
     related to cable regulation.  Cf., e.g., Coplin v. Fairfield Pub.

22  Access Television Comm., 111 F.3d 1395, 1408 (8th Cir. 1997)
     (applying section 555a to action brought by talk show producer

23  challenging city's decision to ban him from public access cable
     channel based on content of his show); Jones Intercable of San

24  Diego, Inc. v. City of Chula Vista, 80 F.3d 320, 324 (9th Cir.
     1996) (applying section 555a to action brought by cable operator

25  challenging city's requirement that it obtain a permit before
     providing cable services).  Accordingly, the court will not deny

26  plaintiffs' claims based on section 555a.

27

28

recovery of their security deposit plus its accrued interest, and defendant has established a right to set off that amount by the amount of CPUC fees plaintiffs deducted from their 2011 and 2012 state franchise fees.  Accordingly, plaintiffs are entitled to the security deposit, interest the deposit accrued prior to the date it was transferred to defendant's account, and prejudgment interest calculated at seven percent per annum[6] the deposit accrued from the date it was transferred to the date judgment is entered in this case, less the CPUC fees plaintiffs deducted from their state franchise fees for the 2011 and 2012 calendar years. Because the parties have not offered the court a calculation of what this sum is, the court will permit the parties to do so before entering judgment on this Order.

IT IS THEREFORE ORDERED that plaintiffs' Motion for summary judgment be, and the same hereby is, GRANTED IN PART and DENIED IN PART, and that defendant's Cross-Motion for summary judgment be, and the same hereby is, GRANTED IN PART and DENIED IN PART, as follows:

(1)   Plaintiffs are entitled to payment of the $100,000 security deposit discussed in this Order, interest the deposit accrued prior to the date it was transferred to defendant's general account, and prejudgment interest calculated at seven percent per annum the deposit accrued from the date it was transferred to the date

_____

[6]     "The legal rate of interest on an obligation before the entry of judgment is 7 percent, unless otherwise specified by statute." Uzyel v. Kadisha, 188 Cal. App. 4th 866, 921 (2d Dist. 2010).  The parties have not cited, and the court is not aware of, a statute that requires a different interest rate in this action.

1        judgment is entered in this case, less the fees imposed

2        pursuant to California Public Utilities Code section

3        441 that plaintiffs deducted from their state franchise

4        fees for the 2011 and 2012 calendar years.

5    (2)  Plaintiffs' Motion and defendant's Cross-Motion are

6        DENIED in all other respects.

7        IT IS FURTHER ORDERED that within fourteen days of the

8   date this Order is signed, the parties shall submit a form of

9   Judgment consistent with this Order, setting forth the amount of

10  payment, if any, plaintiffs are entitled to under this Order.

11  Dated:  April 5, 2017

12

13                          WILLIAM B. SHUBB
                            UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              23